## ERHARD v. BOONE STATE BANK OF BOONE, IOWA, et al.
### No. 9609.

Circuit Court of Appeals, Eighth Circuit.
April 21, 1933.

W. D. Jochems, of Wichita, Kan. (J. Wirth Sargent, C. Edward Murray, and Emmet A. Blaes, all of Wichita, Kan., on the brief), for appellant.

Frank Hollingsworth and Walter R. Dyer, both of Boone, Iowa (John W. Jordan and Dyer, Jordan & Dyer, all of Boone, Iowa, on the brief), for appellees.

Before KENYON and SANBORN, Circuit Judges, and REEVES, District Judge.

KENYON, Circuit Judge.

This is an action by the executor of the estate of Genevieve Erhard (plaintiff in the trial court, appellant here) to impress an equitable lien upon certain assets of the Farmers' State Bank of Boone, Iowa (hereinafter called the Farmers' Bank), conveyed by it to the Boone State Bank of Boone, Iowa (hereinafter called the Boone Bank), and J. H. Roberts and T. L. Ashford, trustees of an express trust (herein called the trustees).

Genevieve Erhard, who died February 12, 1932, was a resident of Wichita, Kan., and, had for many years maintained a savings deposit in the Farmers' Bank, which at the time of the transactions in question amounted to some $6,000.

In July, 1930, an arrangement was made whereby assets of the Farmers' Bank were turned over to the Boone Bank and to the trustees, the Boone Bank assuming liability as to the depositors in the Farmers' Bank.

The deposits assumed by the Boone Bank did not include the account of Genevieve Erhard. In the negotiations leading up to the transfer of assets certain bonds held by the Farmers' Bank known as the Ground Gripper Bonds were objected to by the officers of the Boone Bank, who refused to take them over.

Carl Roberts, cashier of the Farmers' Bank, whose wife was a sister of Genevieve Erhard, by some legerdemain arranged the books of the Farmers' Bank so as to show that Genevieve Erhard had purchased the Ground Gripper Bonds out of her deposit. This act of Roberts was without any authority or knowledge of any kind on the part of Genevieve Erhard. As a result thereof on July 11, 1930, immediately prior to the transfer of assets, the account of Genevieve Erhard disappeared from the books of the Farmers' Bank as a liability, and the Ground Gripper Bonds likewise disappeared from the assets.

As we shall discuss the facts very fully hereinafter, it is not necessary at this point to enter into extended specification thereof. Sufficient has been said to show the general situation out of which this case arose.

Plaintiff, as executor of the estate of Genevieve Erhard, asked judgment against the Farmers' Bank for $6,085.36, and that the same be impressed as a lien upon the assets received by the Boone Bank and by the trus-

tees. No judgment was asked against the Boone Bank.

The defense of the Boone Bank was that what it did was merely to purchase in the ordinary course of business and for full consideration certain assets of the Farmers' Bank, and that it carried on the transaction in good faith without fraud; that the account of Genevieve Erhard had not been certified by the proper banking officers of the state as part of the liabilities of the Farmers' Bank, and that it had not assumed the same; that it had no knowledge of the method by which the Erhard account had been charged off; and that it held the assets taken by it as protection against the liabilities assumed.

Judgment was entered against the Farmers' Bank for $6,035.36, and the relief asked as against the Bank of Boone and the trustees was denied.

The trial court made certain findings of fact, which it embodied in its opinion, to wit: (a) That the Farmers' Bank was not insolvent on July 11, 1930, the date of the contract; (b) that the entire assets of the Farmers' Bank were not transferred to the Boone Bank; (c) that the officers of the Boone Bank knew of the Genevieve Erhard account and the Ground Gripper Bonds being the property of the Farmers' Bank prior to the transfer of the assets to the Boone Bank, and that they also knew that Carl Roberts canceled the Erhard account and withdrew the Ground Gripper Bonds from the assets of the Farmers' Bank; (d) that in September, 1930, Mr. Ashford, president of the Boone Bank, had a conversation with appellant in which Ashford told him that the bank greatly appreciated the Erhard account, and that it was not necessary to change the pass book to a Boone Bank pass book, and that Ashford at that time knew that the actions of Carl Roberts in canceling the Genevieve Erhard account were without authority.

The court in its opinion (3 F. Supp. 463) stated that in view of the testimony of Carl Roberts and the statements of his father that this action on the part of Carl Roberts was done with authority made the testimony as to the conversation of Ashford and plaintiff of little force or effect in establishing that the officers of the Boone Bank knew that the actions of Carl Roberts were unauthorized. The court held that the burden was on plaintiff to show that the officers of the Boone Bank knew that Carl Roberts had no authority to dispose of the Erhard account by using it to buy Ground Gripper Bonds. It held that Ashford's knowledge of the transaction in September, 1930, did not relate back to July, 1930, and that Ashford's knowledge prior to July 11, 1930, of the mere existence of the Erhard account did not put him on inquiry as to the facts surrounding its disappearance and thus make the Boone Bank through him a party to the fraud. The general conclusion of the court seems to have been that this sale was one of a part of the assets, was an authorized corporate act made in good faith on the part of both parties to the transaction for value, and that it could not be assailed by a depositor of the selling bank. The court suggested that Genevieve Erhard had been very badly treated by Carl Roberts, and that his acts were responsible for the loss of her account, but that the evidence was not sufficient to connect the officers of the Boone Bank therewith, and that the remedy of the plaintiff was to proceed against the Farmers' Bank and secure an assessment on the stockholders.

We are unable to accept some of the findings of fact and conclusions of law of the trial court. As this is an appeal in an equity action resulting in a trial de novo, we are not compelled to accept as correct findings of fact which in our judgment in part are erroneous, or conclusions of law drawn therefrom which we think result in an unjust decree. Central Improvement Co. v. Cambria Steel Co. (C. C. A. 8) 210 F. 696; New York Life Ins. Co. v. Simons (C. C. A. 1) 60 F.(2d) 30.

Appellant's claims may be stated as follows:

(1) That when the assets of the Farmers' Bank were transferred to the Boone Bank and the trustees, and the Farmers' Bank practically ceased to exist, it having no assets left out of which the Erhard deposit could be paid, the assets passed to the Boone Bank and the trustees, subject to an equitable lien in favor of Genevieve Erhard.

(2) That the acquisition of the assets of the Farmers' Bank by the Boone Bank in consideration of the assumption of its liabilities, as shown on its books, amounted in law to a merger of the two banks and rendered the Boone Bank liable for any existing liability of the Farmers' Bank at the time of the transfer.

(3) That as the Boone Bank had actual knowledge of the Erhard deposit it took the assets of the Farmers' Bank subject to Genevieve Erhard's equitable right to a lien on the same pro rata basis as other depositors.

(4) That there was an actual fraud perpetrated upon Genevieve Erhard by the offi-

cers of the Farmers' Bank and the Boone Bank through its president, Ashford.

■►Proposition No. 2 advanced by appellant is in our judgment unsound and we shall give it no further attention.

There is no necessity in view of our conclusion of discussing proposition 4, and we refrain from so doing.

We deal therefore with propositions 1 and 3, which are so interrelated that they may be discussed together.

The situation as appears from the evidence is as follows:

Prior to July 11, 1930, the Boone Bank and the Farmers' Bank were going concerns doing a general banking business in the city of Boone, Iowa. There had been some complaint from the state banking department that the capital of the Farmers' Bank was becoming impaired through depreciated bonds, and the department had urged that it consolidate with some other bank. For some weeks prior to July 11th negotiations were in progress looking to the purchase of the assets of the Farmers' Bank and the assumption of its liabilities by the Boone Bank. In these negotiations the Farmers' Bank was represented by J. H. and Carl Roberts (father and son) who were respectively its president and cashier, and B. P. Holst, its vice president and a director. The results of the negotiations were embodied in a contract of July 11, 1930, which was actually drawn up by a member of the state banking department on a form prescribed for such purpose by the Attorney General's office. What the official did was merely to fill in the form with the terms applicable to the particular situation that had been agreed upon by the parties.

As thus finally consummated the contract provided in the main as follows: The Boone Bank assumed the payment of "all existing liabilities to depositors of the said Farmers' State Bank as shown by the books and records of the said bank," the total of the deposit liability thus assumed being $240,614.66. To offset this assumption of liability such assets of the Farmers' Bank as were acceptable to the Boone Bank, totaling $209,851.97, were transferred to the latter. To cover the difference between the liabilities and the assets thus transferred, viz., $30,762.69, the Farmers' Bank executed its note for that amount to the Boone Bank secured by the assets of the Farmers' Bank which the Boone Bank was unwilling to accept outright, totaling $82,-821.04, which assets were placed in a revolving trust for the benefit of the Boone Bank, of which T. L. Ashford and J. H. Roberts

were trustees. For a period of five years the Boone Bank was to have the privilege of exchanging such bills receivable included in the accepted assets as should turn out bad for a like amount of the rejected assets (presumably such as should turn out good) or of their proceeds. As to such bonds included in the accepted assets as should be sold within two years from the date of the contract, any depreciation occurring between that date and the date of sale was to be added to the amount of the Boone Bank beneficial interest in the trust of the rejected assets.

The contract further provided that the obligation of the Farmers' Bank to the Boone Bank for $30,762.69 should be further protected by the assessment liability of the stockholders of the Farmers' Bank. Any amount that should be realized on the trust assets over and above the amount necessary to satisfy the interest of the Boone Bank therein was to be distributed among the stockholders of the Farmers' Bank, which was, of course, but the expression of a forlorn hope. The Boone Bank's interest in the trust was not confined to the amount of the $30,762.69 note, but extended also to the amount of such of the accepted assets as should turn out bad and likewise to the amount of all depreciation thereon. Approximately $24,000 is all that has as yet been realized on the trust assets.

The contract also provided that the Boone Bank was to pay the Farmers' Bank a "bonus" of $3,500; but this amount was likewise to be placed in the trust to secure not only the direct obligation of the Farmers' Bank to the Boone Bank, but also such of the accepted assets as should turn out bad and the amount of any depreciation between the date of the contract and the date of sale on such of the accepted assets as should be sold.

During the negotiations leading up to the above contract and while the officers and directors above referred to were going over the assets and liabilities of the Farmers' Bank, a savings account of approximately $6,000 appeared in the name of Genevieve Erhard, of Wichita, Kan. All parties were aware of the existence of this account, and it was hoped that such a desirable account could be retained after the transfer. There also appeared among the assets, however, six $1,000 bonds of the Ground Gripper Shoe Company, purchased at 98½, which Ashford ascertained to be then selling at 65. They had thus depreciated to $3,900. Ashford was unwilling to accept these bonds among the assets to be transferred to the Boone Bank. Why he was unwilling to have them placed in

the trust along with the other rejected assets does not appear, unless he was also unwilling to have the amount secured by the trust increased by the amount of the Erhard deposit. But taking the testimony as to what followed in the light most favorable to defendants, and as found by the District Court, Carl Roberts on his own responsibility and unknown to any of the defendants proceeded without authority to debit the savings account of his sister-in-law for the purchase price of the Ground Gripper Bonds, figured at 94½, and thus "washed out" both the entire Erhard account as a liability and the Ground Gripper Bonds as an asset. J. H. Roberts then reported to the officers of the Boone State Bank that his son had "sold" the Ground Gripper Bonds to his sister-in-law, and the negotiations for the transfer and assumption were then completed. The Erhard account was thus not included in the schedule of liabilities annexed to the contract, and was therefore not among the liabilities expressly assumed by the Boone Bank.

Carl Roberts' testimony was to the effect that Ashford was entirely aware of what was being done, and in fact aided and abetted. The District Court found that in a conversation between Ashford and appellant, Erhard (husband of the deceased depositor), held at the offices of the Boone Bank in September, 1930, Ashford expressed his appreciation for the Erhard account and told Erhard that it would not be necessary to substitute a new Boone Bank pass book for the old one issued by the Farmers' Bank.

The controlling question in this case is whether all the assets of the Farmers' Bank were in fact taken over by the Boone Bank. Counsel for appellees in their brief insist that they were not; that there remained some $50,-000 in notes and securities, the lease for the bank quarters of the Farmers' Bank, furniture and fixtures, and the stockholders' statutory liability.

These notes and securities were turned over to the trustees for the benefit of the Boone Bank. The passing of certain assets to the bank and others to the trustees for the benefit of the bank was one transaction, and we should look to the entire transaction to determine its nature. The assets transferred directly to the Boone Bank thought to be sound embraced 70 per cent. of the total assets of the Farmers' Bank. The 30 per cent. remaining, of which a large proportion, of course, would not be realized on in full, were taken by the trustees for the benefit of the Boone Bank to secure the obligation of over $30,000 of the Farmers' Bank to it. The re-

version in trust assets that was reserved to the stockholders and creditors of the Farmers' Bank was evidently less than zero per cent. of the bank's real assets.

As to the lease for the banking quarters, Ashford testified that it was the only asset of the Farmers' Bank which neither the Boone Bank nor the trustees took over. It was a lease for three years, which the Farmers' Bank had on the building it occupied. He testified that it was an obligation rather than an asset; that the Farmers' Bank had been unable to sublease the building for as much as it was bound to pay, thus resulting in a loss. The contract provided that whatever proceeds should be derived from subleasing the building should be credited to the trust to further secure the obligation to the Boone Bank. It is quite evident that the lease was not an asset. There is nothing in the record to show any value to the furniture or fixtures or as to what became of them. An attempt was made in the contract to take over by the Boone Bank the double liability of the stockholders of the Farmers' Bank. The contract also provided that the Farmers' Bank should surrender its physical charter, to be held in escrow by the superintendent of banking, "it being the intention that the said Farmers' State Bank does hereby relinquish all its right to conduct a banking business under the above mentioned charter." The $3,500 to be paid by the Boone Bank as a sort of bonus was to be credited to the trust fund. The trial court in its opinion, referring to the transfer of assets, said: "These negotiations resulted on July 11, 1930, in the Boone State Bank purchasing practically all of the assets of the Farmers' State Bank." The extent to which the Farmers' Bank was denuded of all its assets is shown by the following statement in the brief of appellees:

"It is the contention of the Boone State Bank in this case that judgment having been rendered against the Farmers' State Bank for the decedent's deposit that he cannot impress the trust upon the property taken from the Farmers' State by the Boone State in the sale of its assets, before the note is paid in full, but he must resort to the statutory liability imposed against the stockholders of the Farmers' State by statute and not be permitted to disturb the assets of the Farmers' State in the form of notes, etc., deposited as collateral to secure the payment of $30,000.00 note given by Farmers' State to Boone State to cover the gap between assets and liabilities.

"In this event even, the plaintiff cannot have any preference over the Boone State.

It is a creditor to the same extent as the plaintiff and any amount received from the stockholders of the Farmers' State must be shared pro rata between Boone State, this plaintiff, and any other creditors, if there be such.

"Although in the agreement of purchase and sale between the two banks the statutory liability of the Farmers' State Bank seems to have been pledged or conveyed, this liability under the law is not an 'asset' of the Farmers' State Bank and cannot be sold as such under an order or agreement for the 'sale of assets.'"

Surely in the face of the evidence and of this statement in the brief the finding of the District Court that all the assets were not transferred to or for the benefit of the Boone Bank cannot stand. The Farmers' Bank seems to have been bereft of everything except its post office address, save the faint hope that something might be realized from an assessment on its stock, and even that was sought in the contract for the benefit of the Boone Bank.

The picture is then presented of a depositor with some $6,000 of a savings account having her deposit used without authority to buy up questionable bonds worth some $3,900 in the hands of the bank as assets, and denied the right to participate in the assets of her debtor corporation which had been transferred en masse to another corporation and trustees acting for it. When her executor asks to participate as other depositors and does not ask for a judgment against the transferee but only to have a lien established upon the assets pro rata with other creditors, he is told his remedy is to bring a lawsuit to compel an assessment on the stock of the bank that has gone out of business, and is, of course, now completely insolvent. The statement of the evidence would seem to warrant the inquiry as to what possible objection there could be to her sharing pro rata with other depositors in the assets of the bank which she had trusted with her deposit and which assets constituted a fund for the protection of the depositors. This is not the case of an ordinary transfer in the usual course of business of some of the assets of a bank, nor is it the case of taking over all the assets of a bank in a weakened though solvent condition to protect all the depositors. Such procedure the courts have sanctioned. City Nat. Bank of Huron, S. D. v. Fuller (C. C. A. 8) 52 F. (2d) 870, 79 A. L. R. 71; Garvey v. Bankers' Trust Co. (Iowa) 239 N. W. 518.

■ The Farmers' Bank, of course, remained legally liable for the amount of the Erhard account, and judgment was taken against that bank by default. It had ceased to do business as a banking institution. We can see no other conclusion to be drawn from this record than that all the assets of the Farmers' Bank were taken either directly by the Boone Bank, or indirectly for its benefit.

The question of a judgment against the Boone Bank is not here. The purpose of the suit is merely to impress an equitable lien for the amount of the executor's claim on the assets in the hands of the Boone Bank and the trustees which were transferred to them by the Farmers' Bank. The existence of such lien is the only question here involved.

■ The trial court found that the Farmers' Bank was solvent at the time of the transfer of the assets. It is the Iowa rule that a bank is insolvent when it is unable to pay its depositors and other creditors in the ordinary and usual course of business. State v. Childers, 202 Iowa, 1377, 212 N. W. 63; Andrew v. Farmers Sav. Bank of Goldfield, 207 Iowa, 394, 223 N. W. 249.

In Garvey v. Bankers' Trust Co. et al. (Iowa) 239 N. W. 518, 519, the court says: "When a solvent bank becomes insolvent there must be some particular time when it crossed the line from one side to the other. It does not follow that such change is obvious or readily ascertainable to, or by, any person. When a bank closes its doors, it becomes insolvent within the meaning of the law."

■ It is probable that the Farmers' Bank was not insolvent under the rule of these cases immediately prior to transferring its assets. It is fair to say that it was in close quarters financially. This seems to be conceded by counsel for appellees in their brief when they say: "Under the pleadings, and the evidence of plaintiff in this case, the Farmers' State had urgent reasons for disposing of its business in some way, either by sale or consolidation." It possessed something over $32,000 in cash at the time of the transfer and probably could have met its obligations for some little time, but it is apparent from the returns on the assets in the hands of the trustees that it would have had a very difficult time to survive for any substantial period. In the absence of consent of its creditors effecting a novation the liabilities which it sought to transfer along with its assets remained its own, City Nat. Bank of Huron, S. D. v. Fuller (C. C. A. 8) 52 F.(2d) 870, 79 A. L. R. 71, and its depositors could look to it or to the transferee as they chose. The transfer being of all its assets (the stockholders' liability not constituting an asset) it ceased to

have any assets to meet liabilities if creditors should seek to enforce the liability against it. The transfer therefore of the assets resulted in the Farmers' Bank becoming insolvent.

Of course, if the Farmers' Bank was insolvent at the time of the transfer, then there could be no doubt as to the right of plaintiff to an equitable lien on the assets, as the creditors would have the right to share pro rata in them.

The old trust fund theory as to the property of a corporation being a trust fund for the payment of creditors, as laid down in some of the older cases, Upton, Assignee, v. Tribilcock, 91 U. S. 45, 23 L. Ed. 203, has been explained and clarified in later holdings, Hawkins v. Glenn, 131 U. S. 319, 9 S. Ct. 739, 33 L. Ed. 184; Fogg v. Blair, 133 U. S. 534, 10 S. Ct. 338, 33 L. Ed. 721; Hollins v. Brierfield Coal & Iron Co., 150 U. S. 371, 14 S. Ct. 127, 37 L. Ed. 1113, which announce the doctrine that the trust fund theory of corporate assets is really a rule of liability rather than a logical explanation thereof. It is said in Hollins v. Brierfield Coal & Iron Co., supra, at page 385 of 150 U. S., 14 S. Ct. 127, 130, 37 L. Ed. 1113, in discussing the right of a corporation to deal with its property in the same manner as an individual owner does, and referring to the officers of a corporation acting in a fiduciary capacity in respect to the property in their hands, "but, as between itself and its creditors, the corporation is simply a debtor, and does not hold its property in trust, or subject to a lien in their favor, in any other sense than does an individual debtor." The assets of a corporation are probably not a real trust fund for the benefit of its creditors until the actual appointment of a receiver, but this does not prevent equity from surrounding the conveyance away by a corporation of all or substantially all of its assets with certain safeguards for the benefit of creditors. The fact that there may be consideration for the transfer is not all important; the consideration must take such a form as will not unduly prejudice the rights of creditors.

We assume for the purpose of this opinion that the Farmers' Bank was technically solvent when the transfer of its assets was made, but it is apparent it was insolvent shortly thereafter, which bears somewhat on the equities of the situation.

The question then is, What can and should equity do for the protection of a creditor left completely in the cold by such a transaction as here occurred?

The question involved is one of general commercial law in which federal courts will be governed primarily by their own decisions, although, of course, giving due consideration and respect to the holdings of the state courts where the transaction occurred.

We refer first to the Iowa cases on the subject.

Warfield v. Marshall County Canning Co., 72 Iowa, 666, 34 N. W. 467, 469, 2 Am. St. Rep. 263, is valuable on the proposition we are discussing only in its reference to Hibernia Insurance Co. v. St. Louis & N. O. Transportation Co. (C. C.) 13 F. 516. Referring to that case the Supreme Court said: "But in that case the old corporation transferred to the new all of its property. Such is not true in the case at bar."

In Luedecke v. Des Moines Cabinet Co., 140 Iowa, 223, 118 N. W. 456, 457, 32 L. R. A. (N. S.) 616, plaintiff, who was a judgment creditor of the Des Moines Cabinet Company et al. sought to recover the amount of its judgment from another company which had taken over all the assets of the cabinet company. The court discusses the proposition of where one corporation has transferred all its assets to another corporation without having paid its debts, and has ceased to exist, whether the property is taken subject to an equitable lien in favor of the creditors of the selling corporation, saying:

"A great many authorities in this country hold to the doctrine that, if one corporation transfers all its assets to another, and thus practically ceases to exist, without having paid its debts, the purchasing corporation takes the property subject to an equitable lien or charge in favor of the creditors of the selling corporation. Some courts announce a modified doctrine declaring that the principle has no application to a sale made in the usual course of business, nor to a bona fide sale for a full consideration in cash or its equivalent. Although announcing in general terms the first proposition, we are probably committed to the modified one in Warfield v. Marshall [County] Canning Co., 72 Iowa, 666, 34 N. W. 467, 2 Am. St. Rep. 263. * * *

"We do not recognize the trust-fund doctrine to the extent that it has obtained in some of the courts; but are of opinion that corporate creditors are entitled in equity to the payment of their debts before any distribution of corporate property is made among the stockholders, and recognize the right of a creditor of a corporation to follow its assets or property into the hands of any

one who is not a good-faith holder in the ordinary course of business."

It held that there was no personal liability on the part of the undertaking company, but that it held the property received subject to a lien for plaintiff's claim.

In Farnsworth v. Muscatine Produce & Pure Ice Co., 177 Iowa, 21, 158 N. W. 741, plaintiff being a creditor of the old corporation, claimed an equitable right to a lien upon the property of that corporation which had passed out of its hands. The court reiterated its stand taken in Luedecke v. Des Moines Cabinet Co., supra, saying at page 747 of 158 N. W., 177 Iowa, 21: "The holding of the court in that case is that a general creditor has not such a lien upon the property of the corporation that he can pursue it in the hands of a bona fide purchaser for a full consideration in cash or its equivalent; that the true rule is that, where the property passes to one who is not a good faith purchaser in the ordinary course of business, a creditor has an equitable right to a lien, which will be enforced by a court of equity, in his favor, against the property in the hands of a purchaser, not protected under what is called the modified rule. The holding is, that the creditors of a corporation in a proper case have an equitable right or lien upon the assets of a corporation, and may pursue this right and have an equitable lien established against the property in the hands of one who is not a good faith, bona fide purchaser. The rule is recognized that, where one corporation transfers all its assets to another, not in the ordinary course of business, the very circumstances of the case imply full knowledge, on the part of the transferee, of all the facts necessary to charge the property, in the hands of the purchaser, with the debts of the seller. * * * *"

In German American State Bank v. Farmers' & Merchants' Sav. Bank, 203 Iowa, 276, 211 N. W. 386, 387, the court had before it the question of whether a lien should be established upon the assets of the Farmers' & Merchants' Savings Bank of Lidderdale, Iowa, which had been transferred to the Farmers' State Bank of Lidderdale without provision for the payment of plaintiff's claim. The court states that corporate assets may be sold and transferred to a transferee in good faith for full value for cash or its equivalent, and says, "If the assets of a corporation are sold and transferred for value and for cash, the fund derived therefrom becomes available for the payment of creditors at once. The theory upon which the assumption by the purchaser is equivalent to cash is that provision is thereby made for the payment of all of the creditors of the debtor corporation." But this statement is inconsistent with the holdings in the New York and Second Circuit cases hereinafter cited, and with the holding of this court in City Nat. Bank of Huron, S. D., et al. v. Fuller, supra, to the effect that the mere assumption by the transferee does not release the transferor. This being the case, the added liability of the transferor can hardly be "cash or its equivalent," in the hands of the transferee with which to meet such liabilities as should still be asserted against it. Nor is the liability of the transferee, which would have to be shared with the transferee's own creditors, "cash or its equivalent" to the creditors of the transferor. It is certainly not equivalent to cash to the creditors whose claims are not assumed. We think the Iowa court was therefore wrong in saying that the assumption by the transferee may be the equivalent of cash, and are not required to follow it. Defendants here knew when the assets of the Farmers' Bank were taken over that all creditors whose claims were not assumed by the Boone Bank had no substantial recourse unless they could reach transferred assets in the hands of the transferees.

The case particularly relied on by appellees is Garvey v. Bankers' Trust Co. et al. (Iowa) 239 N. W. 518, and that case is undoubtedly some authority for appellees' position. The court deemed the question of fact a close one. It lays stress on the proposition that the depositor was not entitled to relief against transferee of assets without proof of insolvency. It was a suit to have an equitable lien impressed upon assets of a savings bank transferred to a trust company. There are some distinctions between that case and the one at bar. In the Garvey Case it does not appear that all of the assets were transferred to the trust company, and while the savings bank intended eventually to go out of business it did not do so immediately but received $100,000 from the trust company for its immediate use. The savings bank was not left without any assets which could be reached by its creditors. The transferee bank had no notice of the plaintiff's account. The Appellate Court said: "The records of the savings bank showed that the account of the plaintiff had been withdrawn some months previous and the account was balanced and closed. * * * The transaction was entered into in the utmost good faith and with the primary objective of protecting the depositors of the savings bank. The plaintiff's name did not appear in the list of depositors; nor did his al-

leged deposit appear in the list of liabilities, as assumed by the trust company." There were no strings whatsoever attached to the use of the $100,000 by the transferring bank, as there were to the $3,500 bonus in the present case, and the record here shows the account in question existed on the bank books the day before the transfer.

While the question of insolvency was involved in the Iowa cases, yet doctrines applicable to transfer of assets by solvent corporations were considered. In Luedecke v. Des Moines Cabinet Co., supra, the court quoted with approval from Thompson on Corporations, § 6547, as follows:

"And while the right to follow a trust fund into the hands of a third party depends upon the answer to the inquiry whether such third party took it with knowledge of the trust, the case being one where the trustee who transferred it to him had a power of disposition, yet in such a case as we are supposing, where one corporation transfers all its assets to another, not in the ordinary course of business, the very circumstances of the case imply full knowledge, on the part of the transferee, of all the facts necessary to charge the property in his hands with the debts of the transferror."

Certainly the transfer of all the assets of a bank cannot be said to be "in the ordinary course of business" even granting that except as to creditors unduly prejudiced thereby, the transfer may be perfectly legal, and the assumption of its liabilities is by no means "full value," to the transferring bank's creditors. Under the Iowa rule as set forth in these decisions defendants here cannot claim the position of a bona fide purchaser cutting off unknown claims.

There is some confusion in the argument of appellees as to the application here of cases where personal liability was sought as against defendants, as in Luedecke v. Des Moines Cabinet Co., supra. The liability here asserted rests on entirely different principles. It is based on the fact that the transferring bank did not receive in return "cash or its equivalent" with which to meet the claims of creditors not taken care of in the transfer of all its assets.

In Valley Bank et al. v. Malcolm, 23 Ariz. 395, 204 P. 207, 212, the Supreme Court of Arizona makes some very pertinent observations concerning the transfer of assets of a financially embarrassed bank to another. This was a case where the plaintiff was a creditor of a certain bank at the time of the transfer of its assets. He had a cause of action against that bank, which was reduced to judgment. The transfer of the assets was carried out with no intent to defraud any one, and the transferor bank was completely divested of all assets or property of any kind, leaving nothing to be reached by creditors. The question was whether a creditor could follow the assets of the debtor corporation into the hands of the purchaser. The court lays stress upon the fact that the purchasing bank took all of the assets of the selling bank, leaving the latter nothing with which to satisfy claims of creditors, and that it took with full knowledge of the inability of the selling bank to meet its obligations. It had no knowledge of plaintiff's claim, but the court says it was bound to know that liabilities might exist, and is charged with the consequences which "flowed from its taking over the entire assets of its vendor without any provision being made for possible liabilities later." We quote from the opinion: "The purchase by one bank of the assets of another, in consideration of the assumption of debts by the purchasing corporation, equal, or substantially equal, to the value of the assets taken, does not in itself subject the purchasing corporation to liability for other debts of the selling corporation. * * * Such transfer, which does not divest the former corporation of all its assets or leave it in a condition in which it is unable to respond to the demands of the creditors, differs in no way from the ordinary purchase, and subjects the purchaser to no greater liability. But when, added to this, the selling corporation is left entirely without assets or means of payment of its debts to creditors whose debts have not been assumed by the purchaser, and the purchase is made with knowledge on the part of the purchaser that such is the situation, if any such debts exist, the rule stated in Williams v. Commercial National Bank, supra, would seem to be the more reasonable one and best supported by the authorities."

In Williams et al. v. Commercial Nat. Bank, 49 Or. 492, 90 P. 1012, 1015, 91 P. 443, 11 L. R. A. (N. S.) 857, referred to, the court quotes with approval from 10 Cyc. 1265, as follows: "Where one corporation transfers all its assets to another corporation, and thus practically ceases to exist, without having paid its debts, the purchasing corporation takes the property subject to an equitable lien or charge in favor of the creditors of the selling corporation. * * * In such a case as we are supposing, where one corporation transfers all its assets to another, not in the ordinary course of business, the very circumstances of the case imply full knowledge on

the part of the transferee of all the facts necessary to charge the property in his hands with the debts of the transferrer," and says: "It is not necessary that a fraudulent intent or want of consideration be disclosed. The property is a fund that the law sets apart or charges with a lien in favor of creditors. The debtor corporation cannot dispose of it or incumber it to the prejudice of the creditors, and such a grantee with notice takes it subject to such equitable lien."

A leading case on this subject not cited in the briefs, but which seems to strongly support appellant's contention, is Cole v. Millerton Iron Co. et al., 133 N. Y. 164, 30 N. E. 847, 28 Am. St. Rep. 615. The facts as set forth were: "The plaintiff is a creditor of the National Mining Company, a corporation formed and existing under the laws of this state. He commenced an action to recover damages done to his property by the wrongful act of the corporation, serving the summons in October, 1887, and recovering judgment in July of the next year. During the pendency of the action all the property and assets of the debtor corporation were transferred to the Millerton Iron Company, also a domestic corporation, upon a nominal consideration, except an assumption by the vendee of the debts of the vendor; and thereupon the former executed a mortgage to the Mercantile Trust Company covering all its property, including that acquired from the National Mining Company. When the plaintiff obtained his judgment nothing remained upon which it was a lien, and his execution was returned unsatisfied. He then began this action, in which he assailed the transfers made, with a view of subjecting the property of the debtor corporation to the satisfaction of his debt." The creditor company was not insolvent at the date of the transfer, but the transfer suspended and terminated its business. The court found it voluntarily stripped itself of all its property and assets and became incapable of performing its corporate duties, saying, "Such a transfer, which involves the destruction of the corporation and an abandonment of the purposes of its organization, is illegal as against creditors whose rights are thereby sacrificed and their remedies destroyed. The transfer was illegal also because made in contemplation of insolvency. Those who accomplished it knew its necessary, and the inevitable, effect would be to make the corporation unable to pay its debts, and must be held to have intended that consequence of their acts. * * * As against the creditor, the transfer to the Millerton Company was illegal, and in fraud of his

rights. The assets of a corporation are a trust fund for the payment of its debts, upon which the creditors have an equitable lien, both as against the stockholders and all transferees except those purchasing in good faith and for value."

The case at bar is stronger as to the equitable position of the depositor whose claim was not included in the assumption of liability by the transferee, and who unless allowed to prevail here will have also lost the financial responsibility of the transferor.

We turn to some of the decisions in the federal courts bearing on the proposition under discussion.

In Hibernia Ins. Co. v. St. Louis & New Orleans Transp. Co. (C. C. Mo.) 13 F. 516, 518, the question of enforcing obligations of an old corporation where a transfer is made to a new owner is discussed. The question there is not entirely analogous to the one here. However, the language of the court is interesting, viz.: "A corporation, unlike a natural person, by disposing of all its property, may not only deprive itself of the means of paying its debts, but may deprive itself of corporate existence, and place itself beyond the reach of process at law. At all events, equity cannot permit the owners of one corporation to organize another, and transfer from the former to the latter all the corporate property, without paying all the corporate debts; and that is the exact case now before us." There the owners of the two corporations were substantially identical. The court says, page 519 of 13 F.: "The thing which we pronounce unconscionable is an arrangement by which one corporation takes from another all its property, deprives it of the means of paying its debts, enables it to dissolve its corporate existence and place itself practically beyond the reach of creditors, and this without assuming its liabilities."

Quite in point to the case at bar is Hunter v. Baker Motor Vehicle Co. et al. (D. C., N. Y.) 225 F. 1006, affirmed Baker Motor Vehicle Co. et al. v. Hunter (C. C. A. 2) 238 F. 894. The facts were these: The Baker Motor Vehicle Company of Ohio had been doing its New York business through a subsidiary, the C. B. Rice Company of New York. At its instigation the C. B. Rice Company transferred all its assets to another subsidiary, newly formed, the Baker Motor Vehicle Company of New York, which in turn assumed all the liabilities of the old C. B. Rice Company. Letters had been sent by the parent company to all the creditors of the C. B. Rice Company stating that the company was insolvent, and

asking their consent to the intended transfer. All of the creditors except the plaintiff so consented, thus effecting a novation. Later the Baker Motor Vehicle Company of New York went into bankruptcy, and the receiver sold all of its assets, including those received from the old C. B. Rice Company, to the parent company, the Baker Motor Vehicle Company of Ohio. The parent company had also proved as a creditor in the bankruptcy proceedings. On suit by the plaintiff it was held that as against him the parent company was unable either to share in the assets as a creditor or otherwise to acquire them, since they had come into the hands of the bankrupt with a trust impressed upon them in favor of the plaintiff, by which the parent because of its intimate relation with the subsidiary was bound.

Despite the statement by the parent company to the creditors of the C. B. Rice Company that the latter was insolvent, and despite a somewhat misleading headnote, there is nothing in the case as reported to show that the C. B. Rice Company was ever in receivership or in fact insolvent. The financial condition of that company at the time of the transfer was thus stated by the court at 1008 of 225 F.: "The actual assets of the C. B. Rice Company were then valued at $116,657.-07, and in point of fact at a fair valuation were worth more than enough to pay all the just debts and obligations of the C. B. Rice Company. The assets of the C. B. Rice Company were actually entered on the minute book of the New York Baker Motor Vehicle Company at the value or worth of $116,-657.07, and upon the same book were entered the liabilities as $79,831.98. Thereupon, without the consent of this plaintiff, the C. B. Rice Company, by bill of sale, etc., transferred all of its assets to this new corporation, the Baker Motor Vehicle Company of New York."

In affirming the decision of the District Court in favor of the plaintiff the Circuit Court of Appeals of the Second Circuit said with respect to the transfer of assets by one subsidiary to the other, at pages 898, 899 of 238 F.: "When the Rice Company transferred all its assets to the New York Company without any consideration other than that the latter would pay the liabilities of the former, the New York Company took the assets subject to the plaintiff's claim and quite irrespective of its express promise to pay the liabilities of the transferrer company. And as the assets received were greater than the liabilities, it was bound to pay the claim in full, irrespective of its promise. Such a

transfer of the assets was a fraud upon the rights of any creditor who did not assent to it, and the plaintiff herein at no time assented to it. The transfer as against the plaintiff could not be sustained, either at law or in equity. The famous statute 13 Eliz. c. 5, declaring transfers made to hinder, delay, or defraud creditors utterly void, was, as Chancellor Kent declared in Sands v. Codwise, 4 Johns. 536, 596 (4 Am. Dec. 305), 'only in affirmance of the principles of the common law.' It is elementary that a corporation cannot give away its assets to the prejudice of its creditors, nor can it, as against its creditors who have not assented to it, transfer all of its assets to another corporation which guarantees the payment of the debts of the former. The express agreement to pay the debts does not constitute a novation, and the corporation, taking the property, holds it subject to a lien in favor of the creditors of the transferrer. Blair v. St. Louis, etc., R. Co. (C. C.) 24 F. 148; Fogg v. St. Louis, etc., R. Co. (C. C.) 17 F. 871, 5 McCrary, 449; Brum v. Merchants' Mutual Insurance Co. (C. C.) 16 F. 140, 4 Woods, 156; Heman v. Britton, 88 Mo. 549; Jefferson National Bank v. Texas Investment Co., 74 Tex. 421, 12 S. W. 101." This is a strong authority for plaintiff's position here.

We think it sound law and in accord with justice that when a corporation transfers all its assets to another corporation and ceases further to exist, having no assets remaining out of which creditors can be satisfied, that the creditors of the transferor corporation can pursue with an equitable lien the assets so transferred. This case goes further, for the Boone Bank took over to itself all of the assets of the Farmers' Bank, either directly or had them trusteed for its benefit, with full knowledge on the part of its officers of the deposits of Genevieve Erhard which existed up to the very time immediately preceding the transfer, and therefore it was in a position where it had a duty to make inquiry as to the situation of this account and its disappearance. Surely the facts here show it was put on notice of her equity.

It seems to us the equities are strongly with appellant. At the time of the transfer of the assets Genevieve Erhard had been defrauded, and her claim had become of an equitable nature. Roberts, one of the trustees, president of the Farmers' Bank, witnessed the making of the entries and the books thereof which wiped out the account of Genevieve Erhard, and this was only one day before the transfer of the assets. The president and vice

president of the Boone Bank had met with the officers of the Farmers' Bank several times to discuss the transfer of assets, and they knew of the Erhard account and that it existed a day or two before the transfer. They seem to have expected this account to pass to the Boone Bank. Ashford testified that the Erhard account was one of the large accounts and that Carl Roberts assured him that it would remain. He further testified that he knew the Ground Gripper Bonds were quoted at that time at 65, which would make their value $3,900, and that Carl Roberts and J. H. Roberts told him they had been sold to Mrs. Erhard. In view of the court's finding that the officers of the Boone Bank knew of the Erhard account and the Ground Gripper Bonds prior to the transfer of the assets and knew that Carl Roberts cancelled the Erhard account and withdrew the Ground Gripper Bonds from the assets of the Farmers' Bank, and in view of the testimony of Ashford that he knew these bonds had been sold to Mrs. Erhard, it would seem some inquiry would have been made as to what had become of the balance of the Erhard account after the $3,900 had been deducted therefrom. If Ashford did not have full knowledge at the time of the transfer that the $6,000 of Genevieve Erhard had been used to buy $3,900 of Ground Gripper Bonds, he knew it later when Carl Roberts informed him of the situation and he sent him to Wichita to straighten the matter up. Even after that Carl Roberts was retained until March, 1932, as assistant cashier of the Boone Bank, when the banking department of the state objected to his further connection with the bank. As the Boone Bank was taking over all the assets of the Farmers' Bank to itself directly or by trusteeship, equity should impose upon it a high standard of care to protect the rights of the depositors. Under the circumstances we see no special hardship upon the Boone Bank in holding that the assets of the Farmers' Bank should be subjected to the right of the executor of Genevieve Erhard's estate to participate in the proceeds thereof the same as other depositors.

We think appellees should be satisfied that no personal judgment against them was sought on the theory of an estoppel growing out of Ashford's conversation with appellant in September, 1930, in which he said as found by the trial court, "that the bank greatly appreciated the account and that it was not necessary to change the passbook to a Boone State Bank passbook." This conversation might have lured plaintiff into a false sense of security. We do not hold there was an estoppel,—the question is not here,—we merely suggest that such claim might be made with some basis. We are satisfied that under the entire record appellees took the assets of the Farmers' Bank subject to an equity of Genevieve Erhard therein, and that a decree should have been entered as prayed by plaintiff impressing the assets of the Farmers' Bank in the hands of the Boone Bank and in the hands of the trustees with such equitable lien as to give to the plaintiff as executor a right to share pro rata with other creditors of the Farmers' Bank in these assets. The decree is reversed and the case is remanded with instructions to enter a decree such as here suggested.

Reversed and remanded.